Argued and submitted April 15, rule held valid July 8, reconsideration denied August 28, petition for review allowed September 22, 1987 (304 Or 185)

# OREGON ENVIRONMENTAL COUNCIL et al,
*Petitioners,*

*v.*

# OREGON STATE
# BOARD OF EDUCATION et al,
*Respondents.*

## (CA A39946)

739 P2d 581

Allen L. Johnson, Eugene, argued the cause for petitioners.

With him on the briefs were Eveleen Henry and Johnson & Kloos, Eugene.

David Schuman, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warden, Presiding Judge, and Richardson and Van Hoomissen, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Petitioners seek the invalidation of the Board of Education's amended rule, OAR 581-11-072, placing the textbook *Get Oregonized* on the list of approved texts for the state's public elementary schools. The essence of petitioners' objections to the book is that, in their view, it teaches that nature and the environment exist to be exploited by human beings. They contend that the Board and the State Textbook Commission erred by approving the book and placing it on the list without following contested case procedures. They argue alternatively that, if the adoption of a rule rather than a contested case is the correct procedure for approving textbooks, the agencies violated substantive and procedural requirements in connection with the promulgation of the rule.

Before we address the merits of those contentions, an overview of the procedures for textbook selection, as described in respondents' brief, will prove useful:

"The State Board of Education appoints a Textbook Commission, ORS 337.011, and also 'criteria committees,' which work under the supervision of the Commission to develop 'guidelines and criteria' used by the Board and the Commission in the selection of textbooks. OAR 581-11-055(2), 581-11-060. These guidelines and criteria must be approved by the Commission, then reviewed and adopted by the Board. OAR 581-11-065.

"Once guidelines and criteria are established, the Board invites publishers to submit materials to be considered for adoption in Oregon public elementary and secondary schools; the materials must include a description of how they meet the guidelines and criteria. ORS 337.030, 337.060; OAR 581-11-075.

"The Commission then considers these materials, and selects a 'multiple choice list.' ORS 337.050. If none of the submitted materials meets the criteria 'to the degree determined by the State Board of Education,' then the Commission must not choose any materials. *Id.* Otherwise, the Commission 'may select or reject any textbook contained in any proposal,' and, if the Commission determines that a textbook does not meet the 'guidelines and criteria,' then it 'may reject' it. ORS 337.075. After deliberating, the Commission reports its lists of selected texts to the Board. ORS 337.080; OAR 581-11-070.

"Although no statute requires the Board to provide any specific person with notice or a hearing, the Board has provided by rule that it 'shall * * * ensure an opportunity to be heard for any person or persons who wish to challenge the adoption of any texts selected by the Commission.' OAR 581-11-070(1). After this 'hearing,' the Board deliberates. It 'shall reject any textbook that [it] finds does not meet, to the degree determined by the State Board of Education, the guidelines and criteria' it has adopted. ORS 337.055. Thus, nothing requires the Board to adopt a text merely because it meets the standards.

"After the Board approves a text, it enters into negotiations with the publisher, ORS 337.090, and circulates a list of the titles it has approved, ORS 337.100. If a school district wants to use a text not included in the Board's list, it may do so. Districts with fewer than 15,000 members may, with Board approval, select texts that meet Board standards. Larger districts also may select texts that meet Board guidelines, but these districts do not need Board approval. ORS 337.141."[1]

Petitioners' first assignment pertains to respondents' failure to conduct a contested case proceeding. Their second and third assignments pertain to the validity of the rule. Because the case does in fact involve a rule, we will deal with the latter assignments first.[2] The second assignment is that the Board exceeded its statutory authority, misinterpreted applicable law and failed to follow applicable rulemaking procedures, because "it failed to make a finding that *Get Oregonized* meets the Board's guidelines and criteria, and failed to demonstrate compliance with other applicable procedures." ORS 183.400(4). Although the assignment refers in terms only to the Board, the Commission's approval of the book is also challenged by petitioners' argument supporting

---

[1] There are portions of this description with which petitioners, at least implicitly, do not agree. We agree with respondents' statement.

[2] Respondents note that it is at least questionable whether the Board's action is a "rule," as defined by ORS 183.310(8). They reason that the action was more in the nature of an application of policy to facts than "a directive of general applicability." They nevertheless conclude that, on balance, the Board's determination could and did take the form of rulemaking. We agree that the Board's final decision comes within the statutory definition of a "rule." It is a "directive * * * of general applicability that implements * * * [the] policy" embodied in ORS 337.035 to 337.055 and the Board's rules and criteria.

the assignment. ORS 337.035, 337.050(1) and 337.055 provide, respectively:

> "The State Board of Education by rule shall establish guidelines and criteria for the review and selection of textbooks to be used in the public elementary and secondary schools in this state." ORS 337.035.

> "The State Textbook Commission shall review and select, for periods established by the State Board of Education, a multiple choice list of textbooks for each grade and subject field in the standard curriculum for which, in its judgment, textbooks are required. The State Board of Education shall consider the best educational interests of the students as well as the most economical method of purchasing textbooks in setting periods for textbook review and selection. The commission shall refrain from selecting any textbook in a subject field, whenever it finds that no textbook can be documented as meeting, to the degree determined by the State Board of Education, the guidelines and criteria established by the State Board of Education for textbooks. The commission may also review and select other instructional material which it considers appropriate for grade and subject fields." ORS 337.050(1).

> "After the State Textbook Commission submits its list of selected textbooks, the State Board of Education shall review the selection list and may ratify or reject any textbook selected. The state board shall reject any textbook that the state board finds does not meet, to the degree determined by the State Board of Education, the guidelines and criteria for review and selection established under ORS 337.035. If a textbook is rejected, the state board shall notify the commission within five days of the meeting at which the board rejected the textbook." ORS 337.055.

The thrust of petitioners' arguments is that the record does not contain certain documents, such as the textbook itself, "necessary to show that the Board did not [*sic*] in fact apply the [statutory and the Board's implementing] criteria" and that the Board and the Commission made no findings to demonstrate that the criteria were applied. The record *does* contain a three-page checklist setting forth the Board's criteria for textbooks in the applicable category, and the Board's resolution approving *Get Oregonized* is preceded by a recital of the relevant language of ORS 337.055, *i.e.,* that the Board must reject any book which does not meet, to the degree determined by the Board, the guidelines and criteria that it has

established. Petitioners argue that those items in the record do not satisfactorily show that the criteria were applied, because, *inter alia,* the checklist was not filled out.

Petitioners rely on the statement in *Kids Against the Cut v. Wage and Hour Comm.,* 41 Or App 179, 597 P2d 1264 (1979):

"The issue is whether the Commission adequately complied with ORS 653.030, which provides:

" 'The commission shall issue rules prescribing the employment of other types of persons at fixed minimum hourly wage rates lower than the minimum wage required by ORS 653.025, when the commission has determined that the application of ORS 653.025 *would substantially curtail opportunities for* employment for specific types of persons. * * *' (Emphasis supplied.)

"We conclude that the Commission did not make the required determination that the otherwise applicable minimum wage would curtail employment opportunities for minors, and [we] therefore invalidate the Commission's action.

"* * * * *

"Petitioners argue, and the Commission seems to assume, that the determination required by ORS 653.030 must be in the form of a formal finding of fact. We need not and do not here so hold. However, whatever form the required determination takes, the limitation in ORS 653.030 is meaningless unless the rulemaking record reveals in some form that the required determination was made. The record here establishes that the required determination was not made in any form." 41 Or App at 181-82. (Footnote omitted.)

Petitioners do *not* concern themselves with this statement in the same case:

"In *Int'l Cncl Shopping Cntrs v. Env. Quality Comm.,* 27 Or App 321, 556 P2d 138 (1976), *rev den* [278 Or 157] (1977), we held the Administrative Procedures Act permits a state agency to adopt rules based on information that is not placed in the record of the rulemaking proceeding. *See also, Int'l Cncl Shopping Cntrs v. Env. Quality Comm.,* 41 Or App 161, 597 P2d 847[, *rev den* 287 Or 508] (1979). We adhere to that interpretation of the Administrative Procedures Act. This case, however, illustrates that the legislature can impose and has imposed additional limitations on state agencies in specific statutes applicable to individual agencies. *See Marbet v.*

*Portland Gen. Elect.,* 277 Or 447, 561 P2d 154 (1977). Here, specifically, ORS 653.030 limits the Commission's authority to reduce the minimum wage for a given class of persons by requiring the Commission *first* determine the otherwise applicable minimum wage 'would substantially curtail [employment] opportunities' for that class of persons." 41 Or App at 181-82. (Emphasis in original.)

The reason for the selectivity in petitioners' reliance on *Kids Against the Cut* is that they perceive ORS 337.055 to contain the same kind of requirement as did ORS 653.030. They state:

"In this case the record of the rulemaking proceedings placing *Get Oregonized* on the state-approved text list lacks any documented finding that the Board, or the Textbook Commission before it, complied with its mandatory directive to select only those books that could be documented as meeting the approval criteria. Absent these findings, the criteria-based statutory scheme for approving textbooks, as set out in ORS 337.035, 337.050, and 337.055 would be meaningless."

■ We do not agree with petitioners' perception. The statute considered in *Kids Against the Cut* required the agency to make a specific determination as a condition precedent to its adoption of a certain kind of rule. The statutes here simply require the agencies to apply certain criteria and guidelines in making textbook selections. They do not require particularized findings or determinations to be spread on or be discernible from the record. Indeed, ORS 337.055 *can* be read as making judging the requisite degree of compliance with its criteria totally discretionary with the Board, and respondents do so read the statute. We need not decide whether that is the statute's meaning, however, because it clearly does not require what petitioners ascribe to it. Assuming that the record must contain *any* documentation to show that the agencies applied the criteria and guidelines, the record here does. Respondents correctly observe:

"The record * * * includes a three-page checklist containing the criteria. Unless the court assumes that the Board knew the criteria and failed to consider them, the presence of the worksheet alone should suffice to demonstrate compliance with ORS 337.055."

■ We reject petitioners' second assignment. Their third

does not merit discussion, and we also reject it. We turn to their first assignment. ORS 183.310(2)(a) provides:

" 'Contested case' means a proceeding before an agency:

"(A)   In which the individual legal rights, duties or privileges of specific parties are required by statute or Constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard;

"(B)   Where the agency has discretion to suspend or revoke a right or privilege of a person;

"(C)   For the suspension, revocation or refusal to renew or issue a license where the licensee or applicant for a license demands such hearing; or

"(D)   Where the agency by rule or order provides for hearings substantially of the character required by ORS 183.415, 183.425, 183.450, 183.460 and 183.470."

Petitioners contend that the agencies' decisions come within all but subsection (B).

Petitioners' bases for asserting that ORS 183.310(2)(a)(A) applies are constitutional and statutory. They argue that ORS 337.050, ORS 337.055 and the Board's rules and criteria contain substantive standards and require the application of those standards in a fact-specific adjudicatory context "upon an application for certification of a textbook." Hence, in petitioners' view, the statutes make textbook selection a determination of "individual legal rights, duties or privileges of specific parties" which can only be made through an adjudicative contested case process. The constitutional aspect of petitioners' argument is:

"The applicable substantive and procedural standards and procedures set forth in the APA and in the textbook statutes and rules give the applicant, school districts, students, teachers, and parents protected [due process] interests in the proper application of the substantive standards and established procedural safeguards." (Footnotes omitted.)[3]

---

[3] In their reply brief, petitioners turn to free speech concerns and state, *inter alia,* "[a] fourth-grade classroom is a 'marketplace of ideas.' " Petitioners make that statement in the context of their point that, if the Commission rejects a book, the Board cannot act on it. Therefore, petitioners reason, the Board's before-the-fact articulation of and its and the Commission's adherence to the guidelines and criteria are essential. However, this case does not involve the rejection of a textbook. It is indeed curious to find the "marketplace of ideas" concept advanced by parties whose objective is to prevent the use of a book. We have considered their free speech and related arguments and reject them.

Respondents offer a trenchant and lengthy refutation of both of petitioners' arguments, and we agree generally with respondents' points. However, petitioners' arguments do not seem to us to require as extensive a response as respondents offer. Even assuming the correctness of all of petitioners' premises, their conclusions are incorrect. Statutory and regulatory criteria are, by definition, designed for application to specific facts. However, petitioners provide no authority, and we know of none, mandating that all agency action which entails the application of standards is "required by statute * * * to be determined only after an agency hearing at which specific parties are entitled to appear and be heard." Aside from that premise, which we reject, petitioners suggest no tenable reason why the textbook selection statutes necessitate that decisions be made through contested case procedures.

■      Petitioners' constitutional argument does not succeed in demonstrating any protectible due process interest of theirs or their members in textbook selection. Despite their attempts to characterize it otherwise, their argument amounts to an assertion that their interest as citizens in the correct application of the law is of constitutional magnitude. They rely for that proposition on *1000 Friends of Oregon v. Wasco Co. Court,* 80 Or App 532, 537-38, 723 P2d 1034, *rev allowed* 302 Or 299 (1986), where we held that the petitioners had a due process right to an impartial decisionmaker in the county's land use proceeding, arising in part from their interest in the proper enforcement of the land use laws. Petitioners' reliance is wholly misplaced. In *Wasco Co. Court,* the petitioners had state law rights to participate in the county hearings and had standing to appeal the county's decision, and their constitutionally protected interest followed from those underlying state law rights. Petitioners turn *Wasco Co. Court,* and the Due Process Clause, backward: Their constitutional contention is that their interest in the correct application of the law is the *reason* why state law must provide them hearing rights; that contention is the converse of the correct proposition, *i. e.,* that a party can have a constitutionially-protected interest in the law's proper application at a hearing *because* that party is entitled to participate in the hearing under state law. Petitioners' constitutional arguments are specious, and we do not agree that respondents were required by ORS

183.310(2)(a)(A) to follow contested case procedures. Petitioners' arguments concerning ORS 183.310(2)(a)(C) and (D) do not require discussion, except to note our concurrence with respondents' observation that petitioners' argument concerning subsection (C) is frivolous.

Respondents conclude their brief by stating:

"In sum, petitioners' dispute with the Board and the Commission derives from an ideological revulsion to *Get Oregonized*. That revulsion may well be shared by others, including Board and Commission members, Court of Appeals judges, and assistant attorneys general. But the citizens of this state have not empowered any of us to guard the political purity of schoolbooks. Rather, they have erected a legitimate administrative procedure designed to [ensure] that local school districts have a variety of adequate texts from which to choose. Those who sincerely believe that this system of procedures has produced an atrocity can either try to convince their neighbors on local school boards not to adopt it, or they can work to change the system of procedures that produced it. In the meantime, their attempt to distort the system we have must not succeed."

There may be occasions, ranging from the state agency level through the stage when particular texts are introduced into the classroom, when colorable and judicially redressable claims concerning the selection or use of textbooks can be advanced. It is noteworthy, for example, that certain criteria, *e.g.*, "[r]espect for all people, regardless of race, color, creed, national origin, age, sex, or handicap," have been legislatively articulated. ORS 337.260. However, the kinds of deficiencies which petitioners find in *Get Oregonized* have not been identified by the legislature or the Board—or the constitutions—as specific or absolute bars to its approval as a textbook. When all is said and done, there is nothing to be said for petitioners' arguments except that they wholeheartedly disapprove of the book, and they have struggled with complete moral conviction but no legally tenable grounds to obtain judicial intervention.

Rule held valid.